TED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| INTEGRITY BIO-FUELS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:13-cv-00768-SEB-DKL |
| | ) | |
| MUSKET CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| | ) | |
| MUSKET CORPORATION, | ) | |
| | ) | |
| Counter Claimant, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| INTEGRITY BIO-FUELS, LLC, | ) | |
| | ) | |
| Counter Defendant. | ) | |

**ORDER ON PARTIES' MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

This matter comes before us on the parties' motions for partial summary judgment.
Plaintiff Integrity Bio-Fuels, LLC filed a Motion for Partial Summary Judgment on August
15, 2014 [Dkt. No. 60] to which Defendant Musket Corporation has responded [Dkt. No.
72]. Likewise, Defendant Musket filed a Motion for Partial Summary Judgment on August
15, 2014 [Dkt. No. 64] to which Plaintiff Integrity responded [Dkt. No. 73]. For the
following reasons, we DENY both parties' motions for partial summary judgment.

## Background and Material Facts at Issue

Integrity brought this action on April 12, 2013, in the Shelby County Circuit Court, seeking recovery for Musket's alleged breach of contract and payment for biofuel delivered by Integrity to Musket, among other theories of relief. On May 10, 2013, Musket removed the case to this Court based on diversity jurisdiction, and followed with its Answer and Counterclaim ("Counterclaim") on May 28, 2013, opposing Integrity's claims in its Complaint and seeking recovery under its own breach of contract, breach of warranty, and negligence theories. The parties agree that a contract between them existed and they agree as to its terms.

Integrity is a fuel manufacturer with a plant located in Morristown, Indiana. [Dkt. Nos. 61 at 2, 65 at 1.] One of the fuels that Integrity manufactures is biodiesel. [Dkt. No. 65 at 1.] In 2012, the primary purchaser of Integrity's biodiesel was Musket. [*Id.*] Musket is the fuel supplier for Love's Travel Stops & Country Stores, with which it shares a common ownership. [*Id.*; Dkt. No. 61 at 2.]

**The Contract.**

Integrity and Musket began their business dealings around 2010 or 2011. [John Whittington Deposition ("Whittington Dep.") at 22.] Contracts between the parties were reached through the use of a third-party broker, Progressive Fuels Limited, and would usually last one to three months and cover the sale of up to one million gallons of B100. [*Id.* at 25-28.] The parties have had at least seven agreements for Integrity to sell 2,520,000 gallons B100 to Musket. [Dkt. No. 73 at 2 (citing Dkt. Nos. 73-2 through 73-8).] Up until June 2012, the parties did not have any serious disagreements or issues between them and

had a generally positive working relationship throughout their numerous contracts and millions of gallons of fuel exchanged. [Michael Whitney Deposition ("Whitney Dep.") at 35; Musket's Resp. to Requests for Admissions at 5 (No. 23).]

On or about March 19, 2012, Integrity and Musket again entered into a contract for the sale of biodiesel (the "Contract"). [Compl. at ¶¶ 6, 23; Counterclaim at ¶¶ 11, 31.] Under the terms of the Contract, Musket was to purchase one million gallons of B100 biodiesel to be sold and picked up in installments from Integrity for $4.99 per gallon between the dates of April 1, 2012 and June 30, 2012. [Compl. at Ex. A; Musket RFA Resp. at 1 (No. 1).] The parties agree that the Contract is an installment contract. Integrity contends that the contract was formalized in a written trade confirmation; however, Musket alleges that the trade confirmation does not reflect all of the terms agreed to by the parties. [Dkt. No. 62-3; Musket RFA Resp. at 2 (No. 3).] The B100 was to be provided with 2012 Code D4 biodiesel RINs (renewable identification numbers) attached. [Compl. at Ex. A.] From April 1 through June 3, 2012, Musket purchased approximately 550,000 gallons of biodiesel from Integrity, which was valued at approximately $2.7 to $2.8 million.[1] [Compl. at ¶ 11; Whittington Dep. at 56-57; Dkt. Nos. 62-6, 62-7.]

**Sale and Purchase of Certified B100.**

When Musket purchased biodiesel from Integrity, the biodiesel was picked up by Gemini trucks at Integrity's plant in Morristown. [Whitney Dep. at 16-17.] Deliveries or

---

[1] The parties dispute the number of gallons delivered. Integrity's records indicate that Musket received 549,424 gallons of B100. Musket's internal correspondence indicates that it received 574,667 gallons of B100. [*See* Dkt. No. 61 at 3-4, 11 n.8; Dkt. No. 72 at 4.]

pickups under the Contract were handled through a scheduler using email. [Taylor Dawson Deposition ("Dawson Dep.") at 40-41.] The fuel was delivered by Gemini to tanks located at Love's stores, and title passed to Love's upon the blending of the product in an underground tank at the Love's store. [Whitney Dep. at 43-44.] Love's blended biodiesel with diesel which it sold to customers. [*Id.*; Brian Kernke Deposition ("Kernke Dep.") at 39.]

To be marketable as B100, biodiesel must meet all of the specifications of ASTM D6751. [Craig Hatfield Deposition ("Hatfield Dep.") at 9-10, 14-16, 43; Kernke Dep. at 14, 56-57, 214; Dawson Dep. at 48-49, 65-69; Whittington Dep. at 28, 49, 62-63).] Fuel must also meet the specifications of ASTM D6751 to be eligible for RINs and tax credits. [Dawson Dep. at 65.]

One of the specifications under ASTM D6751 is that the B100 pass the cold soak filtration test (CSFT). [Whittington Dep. at 27-28; Hatfield Dep. at 15, 46.] A CSFT "is a good indicator for contaminants in the fuel" and is a "specification that has to be passed [for fuel] to be D6751 compliant." [Kernke Dep. at 57.] Integrity's quality control program has been managed by Craig Hatfield since 2011. [Hatfield Dep. at 5-6.] The object of Integrity's quality plan is to follow ASTM D6751. [*Id.* at 15.] When a tank of biodiesel has been fully processed and ready for sale, it is certified by Integrity. [*Id.* at 38, 56.] For each batch of biodiesel that is certified by Integrity, Integrity maintains custody of a sample, referred to as a "retain." [*Id.* at 72-75.]

**Love's Customer Complaints.**

Around May 23, 2012, Love's started receiving complaints from drivers who had fueled at Love's stores regarding plugging of fuel injectors and fuel filters and other similar engine problems. [Kernke Dep. at 31-33, 36-37, 52, Ex. 16.] The majority of these complaints were from customers who purchased fuel at five Midwestern Love's stores: Whiteland, Indiana; St. Paul, Indiana; Bellville, Indiana; Richmond, Indiana; and Jeffersonville, Ohio. [Musket Resp. to RFA at 3 (No. 8).] Upon receiving a number of these complaints, the shared Quality Department for Musket, Love's, and Gemini, headed by Brian Kernke, undertook an investigation to determine the cause of the complaints. [Kernke Dep. at 37.] The investigation revealed that as many as seven suppliers had shipped B100 to the affected Love's stores. [*Id*. at Ex. 16.]

Kernke had been hired by Musket Corporation in May 2006 and has worked in the biodiesel department since 2006. [Kernke Dep. at 8-9.] Since 2007, Kernke has worked exclusively in quality and biodiesel vetting, which involves testing the fuel of new suppliers. [*Id*. at 12.] Kernke's current title is the General Manager of Fuel Quality. [*Id*. at 15.] Kernke has responsibility for the quality of fuel at all of Love's approximately 310 nationwide stores. [*Id*. at 15.]

Kernke investigated the complaints coming from Love's customers and prepared a spreadsheet using the Kepner Tregoe (KT) analysis method.[2] [Kernke Dep. at 34-35, Ex. 16.] Based on his investigation, Kernke believes that the consumer complaints experienced by Love's customers were caused by calcium carboxylate salts caused by bad production from Integrity biodiesel that could have been related to the feed stock used. [*Id*. at 53.] Kernke could not identify the root cause of the bad fuel received from Integrity without additional testing. [*Id*. at 53-54.]

As part of Kernke's investigation, Integrity sent retains from three batches of biodiesel (a batch is that which is held in a tank by Integrity [Kernke Dep. at 157-58])[3] to an independent third party laboratory called Intertek. [Hatfield Dep. at 75.] Intertek tested the samples from Integrity according to the standards of ASTM D6751. The results of the tests were reported to Integrity and shared by Craig Hatfield with Love's in an email dated Monday, June 11, 2012. [Kernke Dep. at Ex. 19.] The results of the testing done by Intertek Labs showed that two of the three sampled retains of the Integrity biodiesel failed the CSFT. [Hatfield Dep. at 75; Herrell Dep. at 78; Kernke Dep. at 148-49, Ex. 26.] As a result of two of the three samples failing the cold soak filtration test, Musket contends that "67% of the product sold by Integrity was not the agreed product under the Contract."

---

[2] Kernke's spreadsheet is an Excel spreadsheet depicting the location and type of complaint lodged by Love's customers. According to Integrity, it "does not involved any technical analysis and states only the location of fuel issues, suppliers for each store, time frame, and impact." [Dkt. No. 73 at 4, n.3.]

[3] The words "batch" and "load" are terms of art used by the parties to describe the amount of biodiesel. One batch represents between 28,000 and 30,000 gallons, or three to four loads. [*See* Dkt. No. 77 at 6, n.7.]

[Dkt. No. 65 at 16.] Integrity disagrees. It contends that the two tested loads "accounted for just 49,051 gallons of biodiesel, or 4.9% of the Contract or 2.5% of all biodiesel sold to Musket by Integrity." [Dkt. No. 73 at 8 (citing Dkt. No. 73-10 (List of Musket Sales)); Dkt. No. 73-14 (Bill of Lading from Integrity Biofuels dated June 4, 2012).]. Integrity contends that other than the two samples that failed the cold soak filtration test, "Musket has not presented a single piece of evidence showing that any other load received from Integrity contained biodiesel that failed to conform to B100 standards." [Dkt. No. 73 at 8.]

**Integrity Plant Shut Down and Improper Certification.**

Around May 25, 2012, Integrity experienced a spike in the CSFT times on one of the batches of its biodiesel. [Hatfield Dep. at 53.] The batch of biodiesel with the high CSFT times during processing was certified by Integrity on May 26, 2012 and sold to Musket. [*Id*. at 54-56.] Hatfield, Integrity's quality control manager since 2011, testified that the batch was incorrectly certified based on samples that had been recirculated through filters when the bulk of the tank had not been recirculated through the filters. [*Id*. at 78-79, 5-6.] Because the samples had been recirculated through the filters when the rest of the tank had not, those samples were not representative of that batch. The samples should have been taken from the tank, at the top, middle, and bottom. [*Id*. at 78-79.] Hatfield believed that if the samples had been done properly, they would not have passed the internal cold soak filtration test and the batch could have been reworked. [*Id*. at 79.]

On June 4, 2012, Integrity's plant manager, Guy Herrell, notified several Musket employees that Musket would not be able to pick up biodiesel from Integrity's plant because a portion of Integrity's B100 needed to be re-washed and re-filtered, resulting in a

temporary shut-down of Integrity's facility. [Herrell Dep. at 48.] That same day, Mr. Herrell sent an email to Taylor Dawson and Michael Whitney at Musket stating:

> Michael and Taylor,
>
> I wanted to inform you that we hit a slug of bad oil in our process and we have shut down the plant trying to get this material in our system cleaned up. According to our records and retains we did not have any bad oil leave the plant. Our quality system is designed for us to catch such a mishap if or when it does arise. We have been working diligently all weekend with extra staff trying different lab tests to resolve the issue. The Biodiesel reacted great, but for some reason it came out a little hazy. We have been working in the lab with various bio wash techniques to find out which method will get this product back to a prestine [sic] shape that Integrity Biofuels standards are set on. Again, I assure you that we will not let any product that does not meet our personal quality standards leave this facility. Because of those high standards I have to regretfully tell you that we are out of product at this time. Once we get back on track I will be the first to let you know. Sorry for the interruption and I hope that we can resolve this quickly.

[*Id*. at 47-48, Ex. 6.] Integrity contends that these issues related to a minor haze in the fuel (none of which had left the plant) and not any failed cold-soak tests. [*Id*. at 46.] According to Integrity, emails informing Musket that it could not pick up product were typical in the parties' relationship, as Integrity was periodically unable to meet a pick-up request from Musket due to Integrity's small production scale. [Dawson Dep. at 43.]

Musket contends that when Integrity shut down its plant for the slug of bad oil, there was no way to predict when production would resume. [Whittington Dep. at 36; Herrell Dep. at 50-51; Hatfield Dep. at 65-66.] Integrity disputes this fact. Integrity claims that it never provided Musket with any reason to believe that Integrity's plant would be shut down for any material period of time. [Dkt. No. 73 at 6.] Specifically, when Herrell informed Musket about the plant shutting down, he stated his belief that the plant issue would be

resolved quickly, and in fact, Integrity was back to producing biodiesel within a week after the shutdown.  [*Id.* (citing Dkt. No. 62).]

**Causation.**

According to Integrity, the Love's customer complaints were allegedly caused by particulates in Integrity's B100, causing the fuel to fail a cold-soak filtration test, a test used to determine fuel's risk of filter/injector plugging under extremely cold conditions [Dkt. No. 61 at 4 (citing Dawson Dep. at 53, 60)],[4] which were unrelated to the June 2012 issue at Integrity's facility because none of the hazy fuel failed any CSFTs or left the plant. [Dkt. No. 61 at 4, n.3 (citing Guy Herrell Deposition ("Herrell Dep.") at 46).]  Musket disagrees, for three reasons:  (1) Integrity admitted fuel quality problems in late May and early June of 2012 as described by Craig Hatfield [Hatfield Dep. at 53-55, 57-62, 78-79]; (2) the Intertek lab results showing the Integrity fuel sold to Musket at this time failed the cold soak filtration test [*Id.* at 72-75; Kernke Dep. at Ex. 26]; and (3) the corroborative testimony of Love's Fuel Quality Manager, Brian Kernke, based on his investigation of the complaints contradicts Integrity's position  [Kernke Dep. at 12, 34, 35, 53, 56-57, Exs. 16, 18, and 19; Kernke Aff. at ¶¶ 1-30].  [Dkt. No. 72 at 1-2.]

Integrity notes that Kernke's spreadsheet indicates other potential causes for the Love's customer complaints.  [Dkt. No. 61 at 5 (citing Kernke Dep. at 34-35, 204-05, Ex. 16).]  Kernke testified that he did not have any of the other suppliers' retains of either

---

[4] Pages 53 and 60 of Mr. Dawson's deposition transcript do not contain an opinion of the cause of the Love's customer complaints; however, Musket did not object to this statement and, as a result, we assume that this citation was in error.

biodiesel or diesel (whose products were commingled with Integrity's) tested by a third party laboratory. [Kernke Dep. at 60-62, 91, 166-68, 204-05, 236-37.] It is Kernke's opinion (which is shared by Musket's third party laboratory, Afton Labs) that the presence of excessive metals (specifically, calcium carboxylate salts) in the subject fuel was the mechanical cause of Love's customer complaints in the relevant timeframe. [Kernke Dep. at 52, 163; Afton Chemical Report.] During his deposition, Kernke was asked to compare the results from Intertek's (a Musket-approved lab) metals content testing concerning Integrity's fuel retains, with the metals content testing performed by Iowa Central on certain Love's customers' end user fuel. [Kernke Dep. at 148-52, 144-46, 158-59, Ex. 26.] In every case, the metals content of Integrity's retains were within specifications, whereas the end user's fuel had metals content which failed the specification. [*Id*. at 150-52, 145-46, Ex. 26.] Musket discounts the significance of this comparison because "[t]he fuel purchased by the Love's customers who provided their samples to Iowa Central may have come from different batches, so that the conclusions that Integrity is trying to assert cannot be drawn by comparing these two results." [Dkt. No. 76 at 7 (citing Kernke Dep. at 152-54, 159-60).]

Kernke's analysis pointed to Integrity even prior to receiving the lab results from Intertek. [Kernke Dep. at 55-56, Ex. 18.] Upon receiving the results from Intertek, Musket claims that it knew for sure that Integrity fuel was the problem causing the customer complaints because two of the three loads were off-spec. [*Id*. at 56, Ex. 18.] As a result of receiving off-spec fuel from Integrity, Musket suspended their blending operations and lost

the opportunity to blend the cheaper biodiesel into its diesel fuel. [Whitney Dep. at 83-84.]

"Integrity unequivocally disputes the fact that its biodiesel was the cause of the customer complaints that were received by Musket's sister company Love's." [Dkt. No. 73 at 7.] Integrity contends that Musket "has failed to produce any fuel samples, contaminated or damaged engine parts, or direct evidence tending to prove Love's customers were damaged by Integrity's biodiesel. Musket, at best, has established only that Integrity was one of the many suppliers who delivered biodiesel to the Love's locations that received customer complaints." [Dkt. No. 73 at 7.]

None of the three Love's stores affected most significantly had filters in place in their biodiesel blending mechanisms – which was a requirement of Kernke's quality control protocols. [Kernke Dep. at 82.] Kernke characterized the lack of filters as a "serious problem." [Kernke Dep. at 82-83, Ex. 22.] However, Kernke also explained that the Love's filters "are a redundant safeguard of the filters that should be in place at Integrity during load out." [Dkt. No. 72 at 14 (Kernke Aff. at ¶¶ 31-33).] Moreover, "[t]he lack of filters at any store would not contribute to any fuel quality problems, and would not be needed if the fuel from Integrity met the controlling ASTM standard." [Dkt. No. 72 at 14 (citing Kernke Aff. at ¶ 34).] Neither the Love's entities nor any third party laboratory has retained the affected engine parts relative to this matter, preventing any further testing on materials or fuel therein. [Kernke Dep. at 65; Funk Dep. at 60-61; LeBlanc Dep. at 13-15.]

**The Parties' Response to B100 Testing and Integrity's Shut Down.**

According to Musket, Integrity's sale of off-spec fuel destroyed the faith that Musket had in Integrity's quality procedures. [Dawson Dep. at 156.] On June 4, 2012, Kernke sent an email to Guy Herrell stating that the use of Integrity's product was suspended and terminating pickups of B100 from Integrity due to Musket's suspicion that Integrity's biodiesel was involved with the complaints they had. [Herrell Dep. at 59; Dawson Dep. at 75-76.] After this June 4, 2012, email, Musket did not pick up any more fuel from Integrity, did not attempt to schedule any more pick-ups from Integrity's Morristown facility, did not request any assurances of Integrity's performance pursuant to the Contract, nor did Musket ask for any other security for performance from Integrity with regard to its obligations under the Contract. [Whitney Dep. at 63; Musket Resp. to RFA at 3 (No. 12); Dawson Dep. at 89.] Around June 11, 2012 Herrell (with Integrity) had a communication with Whitney (with Musket). Herrell was told that Musket would never pick up Integrity's product again, and that Musket has a zero tolerance policy. [Herrell Dep. at 60.]

Integrity contends that it attempted to honor its contractual obligations with Musket by calling Musket employees several times from June through September of 2012 and requesting that fuel be picked up. [Dkt. No. 61 at 7 (citing Whitney Dep. at 52-53; Herrell Dep. at 60-62; Kernke Dep. at 77-81).] Integrity's owner, John Whittington, made multiple calls himself, speaking with several Musket and Love's employees about resolving the outstanding issues and finishing the remainder of the Contract. [Whittington Dep. at 51-53.] Musket disputes the suggestion that Integrity made calls to Musket in the month of

12

June asking for loads of biodiesel to be picked up because none of the cited evidence supports a call in June. [Dkt. No. 72 at 2.] Mr. Dawson described a voicemail from Mr. Whittington to Mr. Whitney in August 2012, which was the first time Integrity offered to sell biodiesel to Musket to satisfy the Contract. [*Id.* (citing Dawson Dep.; Compl. at ¶ 18; Answer at ¶ 8; Whitney Dep. at 17-22).] Whittington testified that in August he offered to buy back the two loads associated with the failed test results. [*Id.* (citing Whittington Dep. at 63).] As a result, Musket contends that Integrity did not attempt to honor the Contract in June and "did not offer to remedy the breach until on or about August 18, 2012, over two months after the breach had occurred." [*Id.* at 3 (citing Dkt. No. 65 at 20).]

According to Integrity, Musket still owes Integrity for between 37,500 and 62,7506 gallons of biodiesel it picked up prior to June 4, 2012, but has yet to submit payment. [Dkt. No. 62-6 (Invoice from Integrity dated 9-20-12).] After the June 4, 2012 plant shutdown, Musket claims that Integrity did not have any certified biodiesel until June 21, 2012. [Dkt. No. 65 at 7 (citing Integrity Answer to Interrogatory No. 15; Herrell Dep. at 59, 65-69).] Integrity disputes this fact as alleged by Musket. Integrity contends that it had biodiesel available for pickup on June 10, 2012. [Dkt. No. 73 at 6 (citing Integrity Answers to Intrrog. at 9-10).] Integrity does not certify its biodiesel until just before its delivery to a buyer. In this case, that did not occur until June 21, 2012, because Musket was the sole purchaser of B100 from Integrity, and Integrity was unable to find a new purchaser on short notice. [Dkt. No. 73 at 6 (citing Dkt. No. 73-9 (list of deliveries).] After Musket suspended the use of Integrity's product, Integrity waited for Musket to request additional loads. [Herrell Dep. at 75-76.]

Musket described the incident of receiving bad fuel from Integrity as the worst quality problem it had seen in a long time.  [Whitney Dep. at 45; Kernke Dep. at 37.] Kernke described the customer complaints they experienced in late May and June 2012 as the worst quality problem he had ever seen at Love's.  [Kernke Dep. at 37.]  Other than the Integrity incident which involved 80 customer complaints, the second worst incident was in 2008 in Illinois involving approximately 8 complaints.  [*Id*. at 85.]

On May 28, 2013, "[o]nce the subrogation attempts with Integrity were unsuccessful," Musket reimbursed Love's for the customer claims Love's paid – which is the same amount stated in Musket's Counterclaim.  [LeBlanc Dep. at 20; Answer and Counterclaim at ¶¶ 21, 24; Dkt. No. 62-17 (Check from Musket to Love's).]  The risk management department at Love's verified that the drivers had fueled within the relevant time frame, that their trucks either drove to or were towed to a repair shop shortly afterward, where the mechanics who worked on the vehicles confirmed that the problems were fuel related.  [Funk Dep. at 60-61.]  As part of the repairs paid for by Love's, most of the claims included dumping out the fuel that had been bought at Love's and replacing it.  [Dkt. No. 72 at 6 (citing Funk Dep. at 62-63).]  The cost of replacing that fuel was part of the reimbursement claim that Love's made initially against Integrity, and then against Musket. [*Id.* (citing Funk Dep. 87-89, Ex. 62).]  The decision to reimburse Love's "was made in conjunction with counsel."  [LeBlanc Dep. at 20.]

## Summary Judgment Standard

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the Court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *Id*. at 255. However, neither the "mere existence of some alleged factual dispute between the parties," *Id*., at 247, nor the existence of "some metaphysical doubt as to the material facts," (*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)) will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.,* 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. *Id*. at 325; *Doe v. R.R. Donnelley & Sons, Co.,* 42 F.3d 439, 443 (7th Cir. 1994). Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir. 1994). But, if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *Celotex,* 477 U.S. at 322*; Ziliak v. AstraZeneca LP,*

324 F.3d 518, 520 (7th Cir. 2003).  Further, a failure to prove one essential element "necessarily renders all other facts immaterial."  *Celotex,* 477 U.S. at 323.

## Analysis

The parties do not dispute a contract existed between them; nor do they dispute the terms of that Contract.  Integrity was to deliver to Musket one million gallons of B100 biodiesel at a price of $4.99 per gallon.  The parties do not dispute that two of three sample tests of Integrity B100 failed a cold soak filtration test (which it was required to pass under the terms of the parties' Contract) and that fuel was improperly certified and sold to Musket.  The parties do not dispute that Integrity "hit a slug of bad oil in our process" and temporarily shut down its plant in early June.  Finally, the parties do not dispute that in late May Musket received complaints from Love's customers regarding plugging of fuel injectors and fuel filters and other similar engine problems.

The heart of the parties' dispute is causation – was it Integrity's B100 biodiesel that caused the problems for Love's customers?  Integrity contends that the nature of its admittedly nonconforming B100 was not the cause of the damages complained of by Love's customers.  Musket argues that circumstantial evidence of customer complaints correlated with both the nonconforming B100 and the Integrity plant shut down thus supporting the conclusion that the cause of the complaints was Integrity's B100.

Integrity seeks summary judgment in its favor that Musket must pay for the biodiesel it received but did not pay for; for the biodiesel that Musket did not accept under the Contract; and, on Musket's counterclaim, that Integrity breached the Contract.  Musket seeks summary judgment on its claim that Integrity materially breached the parties'

Contract (and as a result, Musket's performance is excused). Neither party demonstrates that the undisputed material facts signal victory as a matter of law.

**A.     Integrity's Alleged Breach of Contract.**

No dispute exists that Integrity delivered two batches of B100 that failed CSFT, which is a technical breach of the Contract. However, no record evidence demonstrates that the breach was material as a matter of law or that the breach caused damages.

**1.     A Dispute of Material Fact Exists as to Causation.**

A very clear dispute of material fact exists as to whether Integrity's technical breach in delivering nonconforming B100 caused the damages experienced by Love's trucking customers. This question of causation is an overarching issue embedded in both parties' motions. Unfortunately for the success of the parties' pending motions, "[c]ausation is an essential element of liability in a breach of contract claim" and "[c]ausation is normally a question of fact for the jury." *Isovolta Inc. v. ProTrans Int'l, Inc.*, No. 1:08-cv-1319-JMS-DML, 2011 WL 121727, at *6 (S.D. Ind. Jan. 13, 2011) (citing *Shepard v. State Auto Mut. Ins. Co.*, 463 F.3d 742, 744 (7th Cir. 2006) (applying Indiana contract law)). Questions of fact here preclude the entry of summary judgment for either party.

Musket sets forth circumstantial evidence that problems experienced by Love's customers correspond with Integrity B100. The tracking of Integrity's B100 coupled with the two samples that failed the CSFT resulted in Mr. Kernke's confidence that Integrity biodiesel caused the Love's customer complaints. [Kernke Dep. at 56, Ex. 18.] Musket also points to Hatfield's admission that Integrity certified and sold B100 around May 26, 2012 that should not have been certified. [Hatfield Dep. at 78-79.]

To begin his investigation, Kernke looked at the stores with the most complaints and determined which supplier had provided their most recent loads. He observed a correlation between deliveries of Integrity biodiesel followed by customer complaints. [Kernke Aff. at ¶ 16.] All of the stores that experienced customer complaints had received Integrity biodiesel prior to those complaints. [*Id*. at ¶ 17.] In contrast, there was no such correlation with the deliveries from other suppliers used by Musket for the stores that were affected or that were in the surrounding area. [*Id*. at ¶ 18-23.] The location and timing of the customer complaints, compared with the location and timing of Integrity's deliveries, allowed Kernke to conclude that Integrity was the sole possible source of the contaminated fuel that caused the mechanical problems for Love's truck drivers. Kernke explained that the problems were truck specific and not every truck that fueled at a Love's store during this period had fuel quality problems. [Kernke Dep. at 41-44.][5] Kernke also described how the filters on the Junge blending units at the Love's stores are a redundant safeguard of the filters that should be in place at Integrity during load out. [Kernke Aff. at ¶¶ 31-33.] According to Kernke, the lack of filters at any store would not contribute to any fuel quality problems, and would not be needed if the fuel from Integrity met the controlling ASTM standard. [*Id*. at ¶ 34.]

Integrity calls into question Kernke's opinions, pointing to additional testing by Iowa Central that identified excessive metals present in the subject fuel that were absent in

---

[5] Pages 41 through 44 of Mr. Kernke's deposition were not submitted for the Court's review. However, Integrity does not object to this allegation by Musket.

Integrity's fuel retains. Integrity notes that "the metal content of Integrity's retains were within specifications, whereas the end user's fuel had metals content which failed the specification." [Dkt. No. 61 at 20 (citing Kernke Dep. at 150-52, 145-46, Ex. 26).] Integrity argues that "any high metals content in the fuel had to be the result of an event which occurred after the subject biodiesel left Integrity's plant as the retains of Integrity's supplied product did not show high metals content." [Dkt. No. 61 at 20.] Integrity also argues that the three Love's stores most affected with customer complaints did not have filters in place in their biodiesel blending mechanisms, which violated Musket quality control protocol that Kernke called a "serious problem." [Dkt. No. 61 at 20 (citing Kernke Dep. at 82-83, Ex. 22).]

Integrity argues that Kernke's testimony and affidavit are insufficient for Musket to avoid summary judgment (particularly with respect to Musket's counterclaim for damages paid to Love's customers). At best, Integrity highlights genuine issues of material fact by encouraging us to discount Kernke's opinion because he "fails to point out that Integrity also supplied B100 to multiple Love's stores that never reported any customer complaints" [Dkt. No. 77 at 41] and that he does not explain the high metal content that was absent in Integrity's B100 but present in the customer's fuel. [*Id.* at 4-5.][6]

---

[6] Integrity argues that Kernke's Affidavit cannot contradict his deposition testimony, which is true. [Dkt. No. 77 at 5 (citing *Buckner v. Sam's Club, Inc.*, 75 F.3d 290, 292 (7th Cir. 1996).] However, Integrity does nothing to point out areas of disagreement between Kernke's deposition testimony and his affidavit. [*See* Dkt. No. 77 at 4-5.]

Integrity argues that Kernke is not a qualified expert, pursuant to Fed. R. Evid. 702. [Dkt. No. 77 at 2.][7] However, Integrity undermines its own argument by admitting that Kernke's spreadsheet does not involve any technical analysis. [*See* Dkt. No. 73 at 4.] Integrity summarizes Kernke's spreadsheet as "nothing more than his observation of 'a correlation between deliveries of Integrity's biodiesel followed by customer complaints.'" [Dkt. No. 77 at 4.] Integrity describes Kernke's spreadsheet as "a simple Excel spreadsheet depicting the location and type of complaints lodged by Love's customers for the purpose of narrowing down the potential causes of the complaints, and involved no technical analysis." [*Id.* at 3, n.3 (citing Dkt. No. 62).] Kernke's opinion is a lay opinion for which expert qualification is unnecessary. *See* Fed. R. Evid. 701 ("If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.").

Musket notes that "[i]t is not necessary for a party to produce expert testimony in order to prove that a product is defective." [Dkt. No. 76 at 2 (citing *Fairmont Homes, Inc. v. Bluelinx Corp.*, Cause No. 3:09-CV-323 CAN, 2011 WL 4729877, at *5 (N.D. Ind. Oct.

_____

[7] Integrity argues that if Musket did not disclose Kernke as an expert witness (after the summary judgment briefing), then it would ask the court to strike Kernke's opinions. [Dkt. No. 77 at 2.] This request is unavailing for three reasons. First, Integrity did not file a motion to strike after signaling its concern in its brief at Docket Number 77. Second, expert disclosures are typically exchanged between the parties and not filed with the court, and thus, we have no way to know if Musket disclosed Kernke as an expert witness. Third, and most importantly, Integrity's arguments suggest that Kernke is *not* an expert witness, rather that he is a lay witness. *See infra.*

4, 2011).  As Musket concedes, however, *Fairmont Homes* was not decided at the summary judgment stage.  Although Musket's circumstantial evidence of causation can save its claims summary judgment *against* Musket, such evidence does not carry the day for summary judgment *in favor* of Musket; that determination will be left for the trier of fact.  Indeed, Musket admits that "it is theoretically possible that two or more other suppliers may have provided defective fuel that resulted in customer complaints" but maintains that such a scenario is not plausible.  [Dkt. No. 76 at 3.]  Determinations of plausibility in the realm of possibility fall firmly within the purview of the trier of fact.

Integrity points to the testimony of Chris Funk, who investigated and paid the Love's consumer claims.  [Dkt. No. 61 at 21.]  Mr. Funk explained that it would not have been feasible to ask truck drivers to get all maintenance history and discontinue operations until Love's sorted their claims – particularly when both the drivers and Love's thought the cause of the problems was the fuel.  [Funk Dep. at 52-53.]  Mr. Funk's testimony does not weigh in favor of or against a causation finding as Integrity argues.  Rather, Mr. Funk's testimony may relate to the "business decision" of Love's to pay claims or call into question the veracity of the Love's customer's claims – but it does not show that a lack of causation evidence was admitted by Musket.  [*See* Dkt. No. 61 at 21-22.]  In the end, a genuine dispute of material fact exists as to causation, and as a result, judgment is not appropriate or available as a matter of law.

## 2.     Materiality of Integrity's Technical Breach.

The parties agree that Integrity delivered at least two batches of B100 that failed CSFTs – a breach of the parties' agreement; however, the materiality of this breach effects

the parties' liability after June, 2012. Musket seeks summary judgment in its favor on the issue that Integrity's breach was material. Generally, whether a breach substantially impairs the contract or not is considered a material question of fact.

### a. Ind. Code § 26-1-2-612.

Indiana Code § 26-1-2-612 governs breaches of installment contracts and dictates that when a nonconforming installment substantially impairs the value of the whole contract, there is a breach of the whole contract. It provides:

> (1) An "instalment contract" is one which requires or authorizes the delivery of goods in separate lots to be separately accepted, even though the contract contains a clause "each delivery is a separate contract or its equivalent.

> (2) The buyer may reject any instalment which is non-conforming if the non-conformity substantially impairs the value of that instalment and cannot be cured or if the non-conformity is a defect in the required documents; but if the non-conformity does not fall within subsection (3) and the seller gives adequate assurance of its cure the buyer must accept that instalment.

> (3) *Whenever non-conformity or default with respect to one (1) or more instalments substantially impairs the value of the whole contract there is a breach of the whole.* But the aggrieved party reinstates the contract if he accepts a non-conforming instalment without seasonably notifying of cancellation or if he brings an action with respect only to past instalments or demands performance as to future instalments.

Ind. Code § 26-1-2-612 (emphasis added). Comment 6 to § 612 provides:

> 6. Subsection (3) is designed to further the continuance of the contract in the absence of an overt cancellation. The question arising when an action is brought as to a single installment only is resolved by making such action waive the right of cancellation. This involves merely a defect in one or more installments, as contrasted with the situation where there is a true repudiation within the section on anticipatory repudiation. *Whether the non-conformity in any given installment justifies cancellation as to the future depends, not on whether such non-conformity indicates an intent or likelihood that the future deliveries will also be defective, but whether the non-conformity substantially impairs the value of the whole contract.* If only the seller's

security in regard to future installments is impaired, he has the right to demand adequate assurances of proper future performance but has not an immediate right to cancel the entire contract. It is clear under this Article, however, that defects in prior installments are cumulative in effect, so that acceptance does not wash out the defect "waived." Prior policy is continued, putting the rule as to buyer's default on the same footing as that in regard to seller's default.

*Id.* (Comments) (emphasis added). Integrity is correct that there do not appear to be any Indiana cases explaining how to measure "substantial impairment" of installment contracts under § 612. [*See* Dkt. No. 61 at 14.]

Indiana Code § 26-1-2-612 is based on the Uniform Commercial Code. As a result, caselaw of jurisdictions outside Indiana applying this same section are instructive in defining "substantial impairment." Several courts considering whether a breach "substantially impaired" the value of an installment contract have held that the buyer must present objective evidence that with respect to its own needs, the value of the goods was substantially impaired by the breach. *See, e.g., Arkla Energy Res., a Div. of Arkla, Inc. v. Roye Realty & Dev., Inc.*, 9 F.3d 855 (10th Cir. 1993); *Midwest Mobile Diagnostic Imaging, L.L.C. v. Dynamics Corp. of Am.*, 965 F. Supp. 1003 (W.D. Mich. 1997). To determine whether, based on Musket's own needs, the value of the B100 was substantially impaired by Integrity's breach based on a totality of the circumstances necessarily requires the trier of fact to weigh the evidence, which is inappropriate on a motion for summary judgment. Both *Arkla Energy Resources* and *Midwest Mobile Diagnostic Imaging* were decided after bench trials in which the trier of fact was able to weigh the evidence of substantial impairment. Similarly, both *Holiday Mfg. Co. v. BASF Sys., Inc.*, 380 F. Supp. 1096 (D. Neb. 1974) and *Continental Forest Prods., Inc. v. White Lumber Sales, Inc.*, 474

P.2d 1 (Or. 1970), cited by Integrity [Dkt. No. 61 at 14-15], were decided after a trial on the merits and not on summary judgment. In *Extrusion Painting, Inc.*, the Eastern District of Michigan held that:

> "To establish substantial impairment of the value of an installment, the buyer 'must present objective evidence that with respect to its own needs, the value of the goods was substantially impaired.'" *See Midwest Mobile Diagnostic Imaging,* 965 F. Supp. at 1012 (citing *Arkla Energy Resources v. Roye Realty & Dev., Inc.,* 9 F.3d 855, 862 (10th Cir.1993)); *see also* M.C.L. § 440.2612, cmt. 4. The determination as to whether the alleged breach constituted a "substantial impairment" of the entire contract is dependent upon "the cumulative effect of [the breaching party's] performance under the contract, based on the totality of the circumstances . . . ." *Midwest Mobile Diagnostic Imaging,* 965 F. Supp. at 1015. *Both of these questions regarding "substantial impairment" are questions of fact to be decided at trial by the fact-finder.*

*Extrusion Painting, Inc. v. Awnings Unlimited, Inc.*, 37 F. Supp.2d 985, 997 (E.D. Mich. 1999) (emphasis added). Moreover, one leading treatise on contracts provides: "[w]hether a failure to perform a contractual obligation pursuant to a divisible contract is so material as to discharge the other party to the contract from further performance of its obligations is a question of fact." 15 Williston on Contracts § 45:18 (4th ed.).

A look at the facts cited by the parties highlights the fact finder's role to determine whether the breach by Integrity was a substantial impairment to the rest of the Contract. Musket contends that Integrity's breach undermined Integrity's quality control program and signaled a likelihood of future breaches. [Dkt. No. 65 at 16.] Musket characterizes the breach as a failure of Integrity to deliver conforming B100 in 67% of the batches based on a failure of 2 out of a total of 3 samples tested. [*Id*.] Integrity, on the other hand, characterizes the 49.051 gallons of nonconforming biodiesel as only 4.9% of the one

24

million gallons of biodiesel under the Contract and 2.5% of all of the biodiesel that Integrity sold to Musket. [Dkt. No. 73 at 8.][8]

Integrity urges us to weigh the "long working relationship [of the parties], comprising the sale of millions of gallons of B100 without prior issues" [Dkt. No. 61 at 15 (citing Dkt. No. 61-1 at 35; Dkt. No. 61-4 at 5)] and not ignore "this positive history and goodwill" [Dkt. No. 73 at 12-13]. Whereas Musket contends that Integrity's refusal to acknowledge that its biofuel caused the Love's customers' complaints "provided Musket with absolutely no assurance that the problem would be fixed." [Dkt. No. 72 at 8-9.] Musket contends that "there were multiple loads of fuel provided by Integrity that were followed by customer complaints reflecting a serious breach of quality protocols on the part of Integrity." [*Id.* at 8 (citing Kernke Dep. at Ex. 16).]

Musket points to the magnitude of the damages – that it was the worst quality problem ever seen at Love's, involving 80 customer complaints whereas the second worst incident involved only approximately 8 complaints – as facts demonstrating the substantiality of the breach. [Kernke Dep. at 37, 85.] However, the materiality of the breach from Musket's point of view necessarily depends on the assumption that the

---

[8] Both parties have taken a gamble on causation. Both agree that "Integrity retained samples for each batch of biodiesel that it sold to Musket." [Dkt. No. 77 at 7 (citing Dkt. No. 72).] Yet, neither Integrity nor Musket appears to have conducted tests on these retains. Consequently, it will be for the trier of fact to determine how to interpret the two out of three failing samples – whether they were two isolated failings or whether they represent a nonconformity of 67% of the fuel delivered.

nonconforming fuel from Integrity was the cause of damages for Love's customers – a fact hotly debated by the parties to be determined by the trier of fact.[9]

### b.     Restatement (Second) of Contracts § 241.

Musket points to § 241 of the Restatement (Second) of Contracts (1981) to determine whether Integrity's breach was material (as opposed to causing a "substantial impairment"). [Dkt. No. 65 at 17.] Integrity argues that the § 241 factors are inapplicable here because the parties agree that the Contract is an installment contract, and therefore Indiana Code § 26-1-2-612, discussed *supra*, applies. Even if we applied § 241 (although § 612 is on point), the same result holds true – a genuine issue of material fact exists. "Whether a breach is material is generally a question of fact to be decided by the trier of fact." *Collins v. McKinney*, 871 N.E.2d 363, 375 (Ind. Ct. App. 2007) (citing *Goff v. Graham*, 306 N.E.2d 758, 765 (Ind. Ct. App. 1974)).

The parties dispute whether the breach was material under § 241. The facts to be considered when determining whether a breach is material include:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
>
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

---

[9] Integrity argues that Musket considered the June 4, 2012 email from Guy Herrell related to the "bad slug of oil" and inventory shortage as an anticipatory repudiation. [Dkt. No. 61 at 15-17.] Musket did not make this argument, and thus, we see no reason to consider it.

(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Frazier v. Mellowitz*, 804 N.E.2d 796, 803 (Ind. Ct. App. 2004) (adopting the Restatement (Second) of Contracts § 241 (1981)).

The parties' analysis of the aforementioned five factors emphasizes the wide array of disputed facts. First, Musket argues that Integrity's breach "deprived Musket of 100% of the reasonably-expected benefit of the Contract" because noncertified B100 does not qualify for tax credits and is otherwise more expensive than diesel [Dkt. No. 65 at 18], whereas Integrity notes that it offered to buy back two batches of the biodiesel that failed to conform and stood ready to ship B100 under the Contract [Dkt. No. 73 at 14].

Second, the parties disagree over whether adequate compensation exists for the breach – Musket claiming that monetary damages would not provide Musket with adequate assurances of a functioning quality control program [Dkt. No. 65 at 18-19] and Integrity claiming that the parties' long history of over 2.5 million gallons of biodiesel without a single quality issue and its offer to buy back the nonconforming fuel and assurances to deliver the remaining product would adequately compensate Musket [Dkt. No. 73 at 14-15].

Third, Musket argues that because Integrity maintained custody of the remaining biofuel under the Contract, it could sell the fuel to others and not suffer a forfeiture. [Dkt. No. 65 at 19.] Integrity retorts that it did suffer a forfeiture because Musket agreed to pay

$4.99 per gallon for B100 and it was only able to sell the biofuel to a new buyer for between $4.15 and $4.50 per gallon after Musket canceled the Contract. [Dkt. No. 73 at 15.]

Fourth, Musket takes the position that, at the time of breach, "it appeared very unlikely that Integrity would be able to cure the breach" because the problem was Integrity's unreliable quality control problem and the unpredictable length of the Integrity shut down, along with the disputed time when Integrity offered to cure. [Dkt. No. 65 at 19.] Integrity responds that Musket had no reason to believe a wide-spread issue existed with the quality of Integrity's B100 and that the shut-down was to be resolved "quickly". [Dkt. No. 73 at 16.]

Finally, Musket claims that Integrity either intentionally or with reckless disregard for the truth attempted to convince Musket that no breach occurred based on Herrell's June 4, 2012 email – an illustration of an absence of good faith in Musket's opinion. [Dkt. No. 65 at 20.] Integrity claims that the parties' long standing relationship supports a good faith finding. [Dkt. No. 73 at 16.] Additionally, Integrity argues that Mr. Herrell's June 4, 2012 email did not relate to the two non-conforming batches of B100, but to "hazy" oil that resulted in the shut down, and none of that oil left the plant. [Dkt. No. 73 at 17.]

Genuine issues of material facts can be found in each aspect of the parties' claims with respect to the materiality of Integrity's technical breach of contract. Whether we apply § 612 or § 641, the result is the same – genuine issues of material fact preclude the entry of summary judgment for either party.

### 3.    Musket's Counterclaim.

Musket has asserted a counterclaim against Integrity seeking three categories of damages: (1) loss of blending credits; (2) loss of blending margin; and (3) reimbursement for amounts that Love's paid to customers whose trucks were damaged by the fuel they purchased from Love's. Integrity argues that a dispute exists as to Musket's alleged loss of blending credits and blending margins and that Musket's payment was "voluntary" and driven by litigation strategy; and as a result is not something for which Musket has a right of subrogation against Integrity.

### a.    Loss of Blending Credits and Loss of Blending Margin.

Musket argues that because Hatfield admitted that some of the B100 should not have been certified in May 26, 2012 and two out of three samples from May 28 and June 1, 2012 failed Intertek testing, Musket has shown that it lost its blending credits and blending margin such that summary judgment should be entered in its favor.

Musket is not entitled to summary judgment for two reasons. First, Musket has put forth no evidence that it did not apply for or was denied blending credits or that its blending margin was lost as a result of the two nonconforming batches of Integrity B100. None of the record evidence supports such a conclusion. Musket claims that it suspended its blending operations on June 4, 2012 at three locations based on the belief that Integrity's B100 was defective and caused the customer complaints. [Kernke Dep. at 199-203.] On June 20, 2012, Kernke sent samples of the B100 remaining in Love's tanks for CSFTs and shortly thereafter resumed blending operations. [*Id.* at 199-203, Ex. 26.] Musket then jumps to the conclusion "[n]o additional evidence of causation is needed vis-à-vis the loss

of blending credits and blending margin than the non-conformity of the Integrity Biodiesel." [Dkt. No. 72 at 13.]

We cannot join Musket in this logical leap. Musket has not demonstrated that its belief was reasonable, that it suffered any damages from suspending blending operations, or that a suspension of blending operations for at least 16 days was reasonable. In fact, the results of the testing of the remaining B100 that warranted the resumed blending operations "shortly thereafter" may suggest that the length of the halt of operations was not warranted. The belief that another party caused you harm is not enough to carry the day to prove causation on a breach of contract claim.

Second, Integrity cites evidence that Kernke testified that Integrity's B100 was "already blended off" and "basically gone out of the system" by June 4, 2012. [Kernke Dep. at 64.] As a result, a question of fact exists as to Musket's alleged loss of blending credits and blending margins between June 4 and shortly after June 20, 2012. There is simply not enough information on the basis of which to grant summary judgment in favor of either party on these two parts of Musket's damages claim.

### b. Damages Paid to Love's for Customer Claims.

Musket seeks to recover the amount it reimbursed Love's for payment to customers who submitted a claim for truck damage as a result of bad biodiesel purchased from Love's in the amount of $367,973.94. [*See* Dkt. No. 16, Counterclaim.] Integrity seeks summary judgment in its favor on Musket's counterclaim for two reasons. First, Integrity argues that the payments by Musket were voluntary and therefore Musket is not entitled to any

subrogation rights against Integrity. Second, Integrity argues that Musket cannot prove Integrity caused the damages to the Love's customers' trucks.

According to Integrity, "Musket voluntarily reimbursed Love's dollar-for-dollar for the claims Love's paid to its biodiesel customers stemming from May and June 2012 complaints at five Indiana and Ohio retail Love's locations." [Dkt. No. 61 at 18.] Integrity argues that under Indiana law, "voluntary payments do not entitle the payor to subrogation of the payee's claims." [Dkt. No. 61 at 18 (citing *Homeowner's Loan Corp. v. Henson*, 29 N.E.2d 873, 875 (Ind. 1940).] Under Indiana law, "a person making payment is a mere volunteer not entitled to subrogation if in making payment he has no right or interest of his own to protect and acts without obligation, moral or legal, and without being requested to do so by a person liable on the obligation." *Ohio Cas. Grp. of Ins. Cos. v. Royal-Globe Ins. Cos.*, 413 N.E.2d 678, 679 (Ind. Ct. App. 1980). Indiana's Supreme Court has stated: "It is a maxim of the law, that what one may be compelled to do by suit, he may do without suit. No good purpose would have been subserved by withholding payment until suit and judgment; but payment without suit saved useless litigation and unnecessary costs." *Burbank v. Slinkard*, 53 Ind. 493, 495-96 (1876); *see also National Mutual Insur. Co. of Washington, D.C. v. Maryland Cas. Co.*, 187 N.E.2d 575, 577 (Ind. Ct. App. 1963). The Indiana Court of Appeals stated that "equitable subrogation is a highly favored doctrine that demands liberal application." *Milikan v. Eifrid*, 968 N.E.2d 243, 252 (Ind. Ct. App. 2012).

Integrity cites no facts in support of its position that Musket's payment was purely voluntary.[10]  Integrity argues that Musket "fails to cite any evidence showing that Love's ever made a claim for demand for reimbursement."  [Dkt. No. 77 at 9.]  Yet, Integrity, as the party seeking summary judgment, must identify the absence of evidence, before shifting the burden to Musket who is not seeking summary judgment on this claim.  *See Celotex*, 477 U.S. at 325.

Integrity focuses on an argument that Musket made its decision to reimburse Love's "in conjunction with counsel" and thus it was made "for strategic litigation purposes – rather than under a colorable moral or legal obligation to do so as required by law."  [Dkt. No. 77 at 9.]  Yet, the fact that Musket made its decision "in conjunction with counsel," tends to support Musket's claim that it may have had a legal obligation to reimburse Love's; yet, at a minimum, the trier of fact should determine how to construe that fact.

---

[10] Integrity claims that "[i]t is undisputed that there was no agreement between Musket and Love's which would have conferred subrogation rights upon Musket in the event that Musket reimbursed Love's for claims paid by Love's."  [Dkt. No. 61 at 18 (citing Whitney Dep. at 15:16-20).]  This is not a fair characterization of Mr. Whitney's testimony.  Mr. Whitney was asked: "Are there any agreements between Musket and Love's for supply of B100?" to which Mr. Whitney responded:  "No."  [Whitney Dep. at 15.]  This is drastically different from Integrity's argument that "no agreement" existed between Musket and Love's "which would have conferred subrogation rights upon Musket."

Moreover, the facts designated by Musket show, again at a minimum, that a genuine issue of material fact exists as to whether Musket acted with "obligation, moral or legal."[11]

Specifically, Musket cites to Kernke's KT Analysis Spreadsheet which Mr. Kernke used to conclude, in his opinion, that Integrity was the cause of the Love's customer complaints. [Dkt. No. 72 at 10.] Although admittedly circumstantial, these facts construed in favor of the non-movant, that is, Musket, cast doubt on Integrity's claim that Musket's payments were entirely voluntary. Musket shows that only stores receiving B100 from Integrity received complaints; the stores with the greatest amount of B100 from Integrity had the greatest number of complaints; the complaints arose around the same time as Integrity's plant shut down; and at least two of three samples of Integrity's B100 were not compliant with ASTM D6751. [Dkt. No. 72 at 10.] It is Musket's contentions that these facts support its "colorable obligation" to pay Love's for its customers' truck damage and it cannot be said that the facts support an opposite conclusion as a matter of law.

The circumstances here are similar to those in *Aetna Cas. & Sur. Co. v. Katz*, 377 N.E.2d 678 (Ind. Ct. App. 1978). In *Katz*, Aetna Casualty paid out a claim for wind damage to a grocery store. Upon further investigation, the cause of the damage was determined to be a faulty design and construction – a cause not covered under the insurance policy. The court held that:

---

[11] Integrity argues that any claims by Love's against it have been extinguished by the statute of limitations and the fact that Love's has been made whole, the result of which defeats Musket's subrogation claim as a matter of law. [Dkt. No. 61 at 19.] Integrity's argument misses the point. The statute of limitations on Love's claims expired and Love's was made whole *because* Musket paid Love's. Integrity's logical disconnect explains the basis for Musket's claim, but does nothing to defeat it.

> Where the circumstances would lead a reasonable man to conclude that the damage was apparently caused by an incident covered by the provisions of an insurance contract, there is no need for the insurer to delay the payment of the claim for damages until all possibilities of becoming a volunteer are exhausted.

*Id.* at 46. Here, it is for the trier of fact to decide whether the collection of data considered by Musket would reasonably lead to the conclusion that it could be liable to Love's customers. If so, there was no need for Musket to delay payment until all possibilities of it becoming a volunteer were exhausted.

Integrity seeks summary judgment in its favor because "Musket cannot prove the causation element of its 'subrogation' claim against Integrity." [Dkt. No. 61 at 19.] Integrity argues that "Musket cannot establish that any damages alleged in its Counterclaim were caused by Integrity's purportedly defective B100." [*Id.*] For all of the reasons stated above, genuine issues of material fact exist such that summary judgment is not appropriate related to causation for either party. Musket has set forth some circumstantial causation evidence that Integrity caused the Love's customer complaints. Integrity has not shown that under no circumstances could Musket make a causal connection between its nonconforming B100 and the Love's customers' damage. As a result, we deny Integrity's request for summary judgment.

## B.  Musket's Alleged Breach of Contract.

Integrity seeks summary judgment as to its claims for: (1) fuel that was delivered to Musket and for which Musket did not pay Integrity; and (2) fuel that Musket was under contract to purchase and did not.

### 1. Integrity's Claim For Fuel Delivered.

Integrity seeks summary judgment in its favor for fuel delivered to Musket, but for which Musket did not pay Integrity. Integrity claims that one invoice is undisputed and the Court should enter judgment for Integrity as to 7,234 gallons of B100 delivered to Love's Pittsboro, Indiana store. [Dkt. No. 61 at 11.] Yet, as Musket notes, the amount on the Bill of Lading cited by Integrity does not match the 7,234 gallons of B100 for which Integrity seeks summary judgment. The Bill of Lading [Dkt. No. 62-12] indicates 6,996 gallons. Moreover, Integrity's Exhibit D (Musket's Responses to Requests for Admission) does not support its statement that "Musket admits that it had no issues with fuel delivered to this store." [Dkt. No. 61 at 11; Dkt. No. 62-4.] The evidence presented does not support an entry of summary judgment in favor of Integrity for 7,234 gallons of B100 delivered to the Pittsboro Love's.

Integrity is also not entitled to summary judgment for any other outstanding invoices or biodiesel delivered. The parties do not clearly set forth the number of gallons delivered to Musket for which Integrity was not paid. Integrity claims that Musket owes it "for between approximately 37,500 and 62,750 gallons of fuel." [Dkt. No. 61 at 11.] Integrity states that its records indicate 549,424 gallons of B100 were picked up under the Contract and Musket's internal correspondence indicates that it received 574,667 gallons of B100. [*Id.* at n.8.] Musket contends that "Integrity concedes the number of gallons is in dispute" and that it had been invoiced $185,270.30 for fuel that had been picked up. [Dkt. No. 72 at 4.] Integrity claims that the disputed number of gallons accepted by Musket, but for which Musket did not pay "can be resolved during a damages hearing" and "should not

restrict the Court from determining whether Integrity is entitled to summary judgment on its breach of contract claim." [Dkt. No. 77 at 5, n.5.] Integrity includes no authority for this position. Although we are authorized to enter summary judgment on part of a claim, here several facts are in dispute, not the least of which is the number of gallons at issue. We will not enter summary judgment when the facts are unclear or in dispute as is the case with the amount of fuel that was delivered to Musket and for which it did not pay Integrity.

Even if the parties agreed on the outstanding amount owed for an agreed-upon number of gallons of B100 delivered, a dispute exists as to whether the delivered B100 conformed to the Contract and ASTM D6751 (*see supra*). Integrity, as the movant, has not established that the undisputed facts demonstrate that Musket *cannot* prove that Integrity breached the Contract in selling nonconforming goods. [*See* Dkt. No. 61 at 13 ("Musket has the burden to prove a breach of any agreement or warranty caused by any allegedly defective product from Integrity, causation, and specific damages.").] The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an *absence of evidence* to support the non-moving party's case – Integrity has not done this. Musket has set forth evidence to minimally support its claim that Integrity failed to deliver conforming B100. The trier of fact will need to determine the magnitude of the evidence of this breach in light of all of the evidence. Because we construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in favor of the non-moving party on summary judgment, we deny Integrity's request for summary judgment.

36

Integrity argues that because Musket accepted the unknown quantity of B100, Musket must pay Integrity, pursuant to Ind. Code § 26-1-2-607. Musket admits that it stopped paying on the Contract "on or before June 12, 2012 after learning that the fuel it had picked up from Integrity was defective." [Dkt. No. 72 at 4.] It is Integrity's position that Musket did not make an effective rejection of the biodiesel and it could not revoke its acceptance. [Dkt. No. 61 at 11-12.] Musket contends that it revoked its acceptance, pursuant to Ind. Code § 26-1-2-608, and that Integrity's assurances of quality (certificates of analysis) justified Musket's acceptance. [Dkt. No. 72 at 4.] Musket also argues that the defect in Integrity's B100 was not discovered until it was used by consumers – at which point it would be impossible to return the B100 to Integrity. [Dkt. No. 72 at 4.] Musket ignores, however, that § 608 allows for revocation only where the good has not undergone a substantial change in condition. *See* 14 Williston on Contracts § 40:29 (4th ed.). Musket could not revoke its acceptance of Integrity's B100 after it blended the B100 with other biodeisels and regular diesel fuel. *Id.*; *Square D Co. v. Breakers Unlimited, Inc.*, No. 1:07-cv-806-WTL-JMS, 2009 WL 1407019 (S.D. Ind. May 19, 2009).

Although Musket could not revoke its acceptance of the B100, it is not without remedy if Integrity delivered nonconforming B100. [*See* Dkt. No. 61 at 12.] *If* Integrity's B100 was defective, Musket could recover "the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been warranted" plus incidental and consequential damages. Ind. Code § 26-1-2-714. Integrity seems to suggest that because Musket accepted the B100

(and could not revoke its acceptance), Musket *must* pay for the B100 regardless of whether the B100 conformed to the Contract specifications. [*See* Dkt. No. 61 at 11.] This is not the law. Even Integrity agrees that Ind. Code § 26-1-2-714 allows Musket to bring a claim to breach of Contract. Musket has done so with its counterclaim. However, a dispute of fact exists yet again.

Integrity argues that Musket received full payment for Integrity's B100 when it resold the fuel to Love's and thus no difference between the value of the fuel that was warranted and that which was delivered exists. [Dkt. No. 61 at 13.] A dispute exists whether Musket "received full payment for Integrity's B100 when it resold the fuel to Love's" [Dkt. No. 61 at 13] because Musket reimbursed Love's for customer complaints and fuel costs [Funk Dep. at 60-63. 87-89]. Neither party has demonstrated that the undisputed facts prove that Integrity either did or did not cause the damage to Love's customers.

### 2. Fuel That Musket Did Not Pick Up.

For the same reason that Musket is not entitled to summary judgment that Integrity's breach of Contract was material or substantially impaired the Contract, Integrity is not entitled to summary judgment that Musket breached the Contract by failing to pick up the approximately 500,000 remaining gallons of B100 – material facts are in dispute as to the materiality of Integrity's breach. If the trier of fact determines that Integrity's breach was not material, then Musket should have accepted delivery of the remaining 1/2 million gallons of B100. If Integrity's breach substantially impaired the value of the entire

Contract, then a breach exists as to the whole Contract, and Musket was under no obligation to accept the remaining gallons of B100.  This decision must be left to the trier of fact.

## Conclusion

For the foregoing reasons, a myriad of disputes of material fact preclude the entry of summary judgment for either party on the issues raised.  We DENY Plaintiff Integrity Bio-Fuels, LLC's Motion for Partial Summary Judgment [Dkt. No. 60] and we DENY Defendant Musket Corporation's Motion for Partial Summary Judgment [Dkt. No. 64].


03/27/2015

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Oni N. Harton
BOSE MCKINNEY & EVANS, LLP
oharton@boselaw.com

Steven D. Groth
BOSE MCKINNEY & EVANS, LLP
sgroth@boselaw.com

Thomas  Kendrick
DURBIN LARIMORE AND BIALICK, P.C
tkendrick@dlb.net

Ashley Arthur Butz
KIGHTLINGER & GRAY
abutz@k-glaw.com

Nicholas C. Dugan
KIGHTLINGER & GRAY
ndugan@k-glaw.com

Thomas J. Jarzyniecki, Jr.
KIGHTLINGER & GRAY
tjarzyniecki@k-glaw.com

Cynthia A. Bedrick
MCNEELY STEPHENSON THOPY & HARROLD
cabedrick@msth.com

J. Lee McNeely
MCNEELY STEPHENSON THOPY & HARROLD
jlmcneely@msth.com

Jody M. Butts
MCNEELY STEPHENSON THOPY & HARROLD
jmbutts@msth.com